## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION
## CIVIL CASE NO. 2:12-cv-00033-MR-DLH

| | | |
|---|---|---|
| JENNIFER PINKHAM and ROGER PINKHAM, | ) ) ) | |
| Plaintiffs, | ) ) | **MEMORANDUM OF** |
| vs. | ) ) | **DECISION AND ORDER** |
| BANK OF AMERICA, N.A., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 33].

## I.    PROCEDURAL BACKGROUND

This action arises from the Plaintiffs' purchase of Lots 8 and 9 (the "Lots") in River Rock, a planned resort community in North Carolina. After meeting with River Rock's developer, Legasus of North Carolina, LLC ("Legasus), and picking their Lots, the Plaintiffs turned to Bank of America to finance their purchase. Legasus failed to complete the infrastructure and amenities in River Rock and subsequently became insolvent, leaving the PlaintiffS owning land with a value significantly lower than the original

purchase price. The Plaintiffs now bring this action against Bank of America, seeking to hold their lender legally responsible for their losses.

The Plaintiffs initially brought suit in one mass action with other borrower-plaintiffs on December 8, 2011, but the Court severed all claims. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011). The Plaintiffs then refiled an individual Complaint. Following the Court's Order granting in part and denying in part Bank of America's Motion to Dismiss, only Plaintiffs' claims for fraud and for violations of the Interstate Land Sales Act ("ILSA") and the North Carolina Unfair and Deceptive Trade Practices Act ("Chapter 75") remain.

Bank of America now seeks summary judgment on the Plaintiff's remaining claims. For the reasons that follow, the Bank's motion will be granted.

## II.    STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists. Id. Finally, in considering the motion for summary judgment filed by the defendant, the Court must view the pleadings and materials presented in the light most favorable to the plaintiff as the non-movant and must draw all reasonable inferences in the plaintiff's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.  FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiffs, the following is a summary of the relevant facts.

In April 2005, the Plaintiffs Jennifer and Roger Pinkham purchased Lots 44 and 74 in the Grey Rock subdivision in Rutherford County, using SunTrust to finance their lot purchases. [Doc. 33-5, SunTrust Deed of Trust for Grey Rock Lot 74; Doc. 33-6, SunTrust Deed of Trust for Grey Rock Lot 44; Doc. 33-3, Plaintiffs' Interrogatory Responses at ¶ 7]. Jared Cullop and Judd Arnold of VPI Marketing then introduced the Plaintiffs to the Legasus team of developers, Ted Morlok and Tony Corliss, who were involved in the River Rock development. [Doc. 33-7, Plaintiffs' Rule 26 Initial Disclosures at ¶ 1.B]. The Plaintiffs allege that they attended a River Rock sales presentation in New Jersey in November 2005 and reserved the Lots with Legasus. [Doc. 1, Complaint at ¶¶ 54, 67].

The Plaintiffs allege that they met Bank of America mortgage loan officer Stacee Peterson at this presentation, and she handed out business cards to attendees and "told those individuals in attendance to call her with help financing the purchase of lots in River Rock." [Id.; Doc. 33-4, Plaintiffs' Responses to First Requests for Admission at ¶ 11 ("Stacee Peterson from BANA appeared at the NJ promotional event and gave the Pinkhams her business card with regard to financing for River Rock.")]. The Plaintiffs allege in their Complaint that Peterson told them: (1) "that she would invest in River Rock if she could and that she thought that it would be a good

investment"; (2) "that she thought that River Rock was going to be a an exceptional community with first-class amenities"; (3) "that she financed lot loans for many new communities in the previous couple of years and River Rock would be her first choice to buy into because the potential investment returns were much higher in River Rock than in other developments"; and (4) that prices would go up in River Rock because "as any community progresses, prices go up." [Doc. 1, Complaint at ¶¶ 61, 63, 64, 67]. The Plaintiffs allege that after they had reserved their Lots with Legasus, Peterson told them that River Rock had a waiting list since the County had not approved additional lots. [Id. at ¶¶ 68-69]. Peterson also stated that "she thought that River Rock was a terrific project to invest in and that if she could invest in it she certainly would." [Id. at ¶ 71]. The Plaintiffs never received any advertising or promotional materials from Bank of America pertaining to River Rock. [Doc. 33-4, Plaintiffs' Responses to First Requests for Admission at ¶ 9].

The Plaintiffs signed their Purchase Agreements on January 31, 2006 and March 6, 2006. Bank of America is not a signatory to either Purchase Agreement. [Docs. 33-8 and 33-9, Purchase Agreements]. The Purchase Agreements specifically disclaim that the Plaintiffs will obtain any economic benefit from their Lot purchases. [Id. at ¶ 24].

The Plaintiffs admit that, prior to entering into the Purchase Agreements, they did not obtain appraisals of the Lots or even visit the development. [Doc. 33-4, Plaintiffs' Responses to First Requests for Admission at ¶¶ 5, 12–13]. The Plaintiffs admit that Bank of America never prevented them from visiting the Lots. [Id. at ¶ 18]. Rather than investigate their investment purchases, the Plaintiffs instead contend that "they relied upon the bank's reputation and internal procedures to properly vet the values of their lots." [Id. at ¶ 4].

On or about April 10, 2006, the Plaintiffs executed two notes in the total amount of $251,910.00 [Docs. 33-10 and 33-11, Notes], secured by deeds of trust on the Lots in favor of Bank of America, Docs. 33-12 and 33-13, Deeds of Trust]. The Plaintiffs executed the loan closing documents in New Jersey. [See Docs. 33-10 through 33-13]. At closing, Legasus transferred $27,318.00 of Bank of America's financing funds into an account controlled by the Plaintiffs. [Doc. 1, Complaint at ¶79].

In August 2008, some River Rock borrowers began to express concern with the progress of the development. They discussed their potential legal claims, such as ILSA, and began meeting with attorneys regarding their legal options and preserving documents in an Intranet Management system. [Doc. 33-14, August 2008 River Rock E-mail

Correspondence].  As previously noted, the Plaintiffs initiated the present suit as part of a mass action with other borrower-plaintiffs on December 8, 2011.  Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011).

## IV.   DISCUSSION

### A.    Statute of Limitations

In the present case, the Plaintiffs assert claims for fraud, violations of Chapter 75, and violations of ILSA.  Under North Carolina law, the statute of limitations applicable to fraud claims is three years.  See N.C. Gen. Stat. § 1-52(9).  This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence."  Hunter v. Guardian Life Ins. Co., 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, disc. rev. denied, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations.  See N.C. Gen. Stat. § 75-16.2.  While a Chapter 75 claim generally accrues when the violation of the statute occurs, see Jones v. Asheville Radiological Group, PA, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), rev'd in part on other grounds, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have

determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence. See, e.g., Faircloth v. Nat'l Home Loan Corp., 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), aff'd, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. See 15 U.S.C. § 1711. The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted. For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[1], the statute of limitations expires "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). The statute of limitations for an alleged violation of

---

[1] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

> (A) to employ any device, scheme, or artifice to defraud;

> (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]

> (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

§ 1702(a)(2)(D)[2] expires three years after the date of signing of the contract of sale.  See 15 U.S.C. § 1711(a)(1).  This limitations period, however, may be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they exercised due diligence to discover their cause of action before the limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence." Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

Generally, under North Carolina law, the issue of "when fraud should be discovered in the exercise of reasonable diligence is a question of fact for the jury."  State Farm Fire and Cas. Co. v. Darsie, 161 N.C. App. 542, 548 S.E.2d 391, 397 (2003).  Where, however, "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of

---

[2] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed."  15 U.S.C. § 1703(a)(2)(D).

reasonable diligence is established as a matter of law." <u>Drinkard v. Walnut Street Sec., Inc.,</u> No. 3:09-cv-66-FDW, 2009 WL 1322591, at *2 (W.D.N.C. May 11, 2009) (citation omitted).

Here, viewing the forecast of evidence in the light most favorable to the Plaintiffs, the Court concludes that the undisputed forecast of evidence demonstrates that the Plaintiffs' claims are time barred.  The Plaintiffs took possession of their Lots upon closing on April 10, 2006, yet they waited over five years to initiate this action.  The Plaintiffs have failed to present a forecast of evidence that they did *anything* in this interim period to discover their causes of action against the Bank.   In fact, the Plaintiffs have presented no forecast of evidence to show that they even visited the subject property.  They have also presented no forecast of evidence that the Bank committed any affirmative act of fraudulent concealment to frustrate discovery despite their due diligence.

For all of these reasons, the Court concludes that the Plaintiff's claims are time-barred.

**B.   ILSA Claim**

Even assuming that the Plaintiffs' claims are not time-barred, the Plaintiffs' claims under the ILSA are also subject to dismissal because the Plaintiffs have failed to present a forecast of evidence that Bank of America

is a "developer" or "agent" within the meaning of the Act or that Bank of America engaged in a scheme to defraud the Plaintiffs during the lot purchase.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers."  <u>Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.</u>, 426 U.S. 776, 778 (1976).  "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property."  <u>Burns v. Duplin Land Dev., Inc.</u>, 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; <u>see also</u> <u>Burns</u>, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5).  An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA.  See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990).  "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA."  Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort.  It is participating to an unacceptable degree in the marketing of the project.  It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated

in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Here, the undisputed forecast of evidence demonstrates that the Bank was not a co-developer with or agent of Legasus. Bank of America provided no funding for the River Rock development. [Doc. 33-15, Affidavit of Jonathan Rainey ("Rainey Aff.") at ¶ 6]. Further, Bank of America did not sell the lots to the Plaintiffs and was not a party to the Purchase Agreements.

To the extent that the Plaintiffs contend that the Bank engaged in marketing activities on behalf of the developer, the Plaintiffs have failed to present a forecast of evidence that the alleged representations went beyond the ordinary course of dealing with a bank selling loan products to interested customers. In fact, the Plaintiffs have not presented any forecast of evidence that Bank of America engaged in any marketing of *River Rock*, as opposed to the loan products it offered to River Rock purchasers.

The Plaintiffs also argue that because they never received HUD property reports from Legasus, as required by the ILSA, they had the right to rescind the Purchase Agreements. The Plaintiff contends that Peterson's alleged misrepresentations somehow prevented them from subsequently rescinding their Purchase Agreements within the statutory two-year period. See 15 U.S.C. § 1703(c). Notably, the Plaintiffs do not allege such a claim in their Complaint regarding a violation of the ILSA, 15 U.S.C. § 1703(a)(1)(B). Notwithstanding such argument, however, the Plaintiffs have not presented any forecast of evidence that the Bank was aware that the Plaintiffs had not received property reports or that it misrepresented any material facts in order to induce the Plaintiffs to refrain from rescinding the Purchase Agreements on this basis. In any event, this argument is belied by the Plaintiffs' Purchase Agreements, wherein the Plaintiffs acknowledged that these lot sales were exempt from the property report requirement under the ILSA. [Docs. 33-8 and 33-9, Purchase Agreements at ¶ 9]. The Plaintiffs have presented no forecast of evidence to show that property reports should have been provided in this case. Accordingly, to the extent that the Plaintiffs attempt to argue that the Bank induced them to forego a statutory right to revoke the Purchase Agreements, this argument fails.

14

For all of these reasons, the Court concludes that the Bank was not a "developer" or "agent" of River Rock within the meaning of the ILSA. Accordingly, the Plaintiffs' claims under the ILSA are dismissed.

## C.    Fraud Claim

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party.  Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007).  Additionally, the party must demonstrate any reliance on the false representations was reasonable.  See id.  "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate."  Cobb v. Penn. Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011).

The conversations the Plaintiffs had with Peterson in the course of securing financing for their lot purchase do not support a claim of fraud. First, most of Peterson's representations amount to nothing more than expressions of opinions regarding the value or quality of the property as a potential investment.  "A representation which is nothing more than an opinion as to the value of property, absent something more, does not

constitute actionable fraud."  Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984).  North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable "if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener."  Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999).  The Plaintiffs, however, have failed to present a forecast of evidence that Peterson made any of the aforementioned statements while holding a contrary opinion.

To the extent that the Plaintiffs claim to have been misled by Peterson's representations regarding the high demand for River Rock lots (or North Carolina land in general), the Plaintiffs have failed to present a forecast of evidence that such statements were actually false. Furthermore, to the extent that the Plaintiffs claim to have been misled by Peterson's representations that the lots would increase in value over time and that they would be able to re-sell their lots before the loan period expired, such representations "'are not regarded as fraudulent in law,' since they are not misrepresentations of a 'subsisting fact.'"  Smith v. Central

Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

Even if any of Peterson's statements were actionable, no reasonable fact-finder could infer from the forecast of evidence that the Plaintiffs' reliance on such statements was reasonable. "North Carolina courts consistently have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11–CV–42–FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to invest the property with exaggerated value does so at his peril, and must take the consequences of his own imprudence.")).

As the Fourth Circuit has noted, reliance on "booster statements" of "enthusiastic agents" is unreasonable because such statements "are to be expected." See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part). At bottom, Peterson was engaged in the marketing of one thing: the Bank's financial services. That she appeared to affirm and

approve of the Plaintiffs' decision to purchase in River Rock does not change this fact.

Further, it was unreasonable for the Plaintiff to rely on Peterson's opinions when the Purchase Agreement expressly disclaimed any potential economic benefit to the Plaintiffs. [Purchase Agreement, Docs. 33-8 and 33-9 at ¶ 24 ("The Purchaser acknowledges and agrees that the Seller has not promised, suggested, or indicated in any way that the Purchaser will receive any economic benefit whatsoever as a result of the Purchaser's ownership of the Lot, and Seller does hereby disclaim any such promise, suggestion or indication made by any person whatsoever.")].

Finally, the Plaintiffs' claim of reliance is unjustified because they had ample opportunity to conduct an independent investigation of the property and reach their own conclusions about the development and its risks prior to purchasing the property but failed to do so. As the North Carolina Court of Appeals has explained:

> In cases involving the purchase of real property, "[r]eliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

<u>Sunset Beach Dev., LLC v. AMEC, Inc.</u>, 196 N.C. App. 202, 209, 675 S.E.2d 46, 52 (2009) (quoting <u>RD & J Properties v. Lauralea–Dilton Enters., LLC</u>, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)).  Here, the parties were engaged in an arm's length transaction.  The Plaintiffs were sophisticated investors, seeking to "flip" the property in a relatively short period of time for a profit.  Significantly, the Plaintiffs have not presented a forecast of evidence to suggest that the Bank denied them the opportunity to inspect the property or that they were otherwise induced to forego additional investigation as a result of Peterson's representations.

In this respect, this case is easily distinguishable from <u>Phelps-Dickson Builders, L.L.C. v. Amerimann Partners</u>, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Plaintiffs.  In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers.  <u>Id.</u> at 429, 617 S.E.2d at 666.  When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices.  <u>Id.</u> at 432, 617 S.E.2d at 667. The trial court granted the

developer summary judgment, but the Court of Appeals reversed.  In so holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the developer and could not otherwise be readily or easily verified. Id. at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Plaintiffs have failed to present any forecast of evidence to establish that the Bank held any superior knowledge regarding the wisdom of investing in the undeveloped lots in River Rock.  Moreover, the Plaintiffs have failed to present anything to indicate that information regarding the development was exclusively in the control of the Bank and could not have been readily verified by the Plaintiffs.  Indeed, the Plaintiffs had many means available to them to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property.  The Plaintiffs, however, chose to forego any independent investigation of their investment prior to purchase, relying instead on the Bank to "vet the values" of the property and ensure that the Plaintiffs were getting a good deal.  The Plaintiffs, however, had no basis under the terms

of the loan or otherwise to impose any such obligation on the Bank. Under these circumstances, the Bank cannot be held liable for the Plaintiffs' failure to conduct their own due diligence.

Further, the Plaintiffs' asserted reliance was unjustified because their relationship with the Bank was contractual and did not give rise to a fiduciary duty to ensure that the Plaintiff was making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n–Village of Penland Litig., 217 N.C. App. 199, 212, 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers "cited no authority tending to establish that [the lender] had a legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development]."), cert. denied, 731 S.E.2d 687 (2012); Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party").[3]

---

[3] To the extent that the Plaintiffs base their fraud claim on the Bank's use of allegedly inflated appraisals, the Plaintiffs have not presented any forecast of evidence to suggest that the Bank had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Plaintiffs have offered no forecast of evidence that they relied on these appraisals in purchasing their property. Indeed, neither of the Plaintiffs even saw an appraisal before entering into the purchase agreement.

For all of these reasons, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' fraud claim.

**D.    Chapter 75 Claim**

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." <u>Spartan Leasing, Inc. v. Pollard</u>, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991).  A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required."  <u>Id.</u> at 461, 400 S.E.2d at 482.

To the extent that the Plaintiffs' Chapter 75 claim is derivative of their claims for fraud and violations of the ILSA, such claim also fails for the reasons set forth above.  <u>See SilverDeer, LLC v. Berton</u>, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing <u>Governor's Club, Inc. v. Governors Club Ltd. P'ship</u>, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

The Plaintiffs contend that the Bank violated Chapter 75 by "align[ing] itself with the developer, promoting River Rock as an investment, and creating loan programs around it."  [Doc. 36 at 19].  The Plaintiffs' assertions that the Bank should be held liable for its close association with Legasus, however, are insufficient to state a claim under Chapter 75

absent a forecast of evidence that the Bank was an actual or apparent agent of the developer.  See In re Fifth Third Bank, 217 N.C. App. at 211-12, 719 S.E.2d at 179-80 (dismissing Chapter 75 claim based on allegations that lender "gave an air of legitimacy to the Penland development by virtue of its involvement in the developers' lot sales program" and that lender clearly "had an agreement or working relationship with the developers with respect to the Penland lot loans.").

The Plaintiffs appear to have abandoned their Chapter 75 claim to the extent that such claim was based on a theory that the use of inflated appraisals by the Bank as part of its loan underwriting process constitutes an unfair or deceptive trade practice.  Even if the Plaintiffs were to pursue this theory, however, their claims would nevertheless be subject to dismissal as the undisputed forecast of evidence demonstrates that the Plaintiffs did not even see an appraisal prior to closing and, in any event, their Purchase Agreement was not dependent on such appraisal.  As such, the Plaintiffs could not have reasonably relied on the appraisal in proceeding with their lot purchase.  See In re Fifth Third Bank, 217 N.C. App. at 211, 719 S.E.2d at 179 ("Thus, given the complete absence of any evidence tending to show a causal connection between the allegedly defective appraisals and the injury that Plaintiffs claim to have suffered, we

conclude that the allegedly defective appraisals do not support a finding of liability pursuant to [Chapter 75].").

Finally, the Plaintiffs cannot establish an unfair or deceptive act based on the Bank's ostensible failure to prevent them from finalizing their lot purchase during the origination and underwriting process. The Plaintiffs, like the other Plaintiffs who have filed similar actions against the Bank, appear to argue that because the Bank was required to perform some due diligence to assess its risk in deciding whether to make the Plaintiffs a loan, the Plaintiffs should be entitled to rely on the Bank's representations as to the result of that due diligence inquiry. That, however, is not the law. The Bank's role in this transaction was to provide financing; it had no contractual duties to the Plaintiffs outside of that role. See Camp, 133 N.C. App. at 560, 515 S.E.2d at 913. Thus, there is no contractual duty to the borrower to make any assurances about the product that the borrower is buying. Moreover, a bank performs its due diligence investigation for the purpose of conducting (and protecting) *its business* – not its customers. There is no fiduciary duty that arises to the borrower. Thus, the Bank had no obligation to advise the Plaintiffs regarding the quality of the investment or to "vet the values" of the lots for which they sought financing. See In re Fifth Third Bank, 217 N.C. App. at 213, 719 S.E.2d at 180 (noting that

lender has no "legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to Plaintiffs . . . any other deficiencies associated with the [development]").[4]

In sum, the Plaintiffs have not presented any forecast of evidence establishing that the Bank committed any unfair or deceptive action during the Plaintiffs' lot purchase. Accordingly, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' claim under Chapter 75.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine disputes of any material fact and that the Defendant is entitled to judgment as a matter of law.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 33] is **GRANTED**, and this action is hereby **DISMISSED**.

---

[4] Because the Court concludes that the Plaintiffs' Chapter 75 claim should be dismissed on the merits, the Court need not address the Bank's argument that the Plaintiffs' place of residence outside of the State of North Carolina precludes their recovery under Chapter 75.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Martin Reidinger
United States District Judge